## Case No. 11,310.

### POSTMASTER GENERAL v. NORVELL.

[Gilp. 106.] [1]

District Court, E. D. Pennsylvania. Nov. 17, 1829.

POSTMASTER'S BOND — APPROVAL AND ACCEPTANCE — EVIDENCE OF—RETURN FOR ADDITIONAL SURETY—SEVERAL BONDS WITH DIFFERENT SURETIES — APPLICATION OF PAYMENT TO ONE OF SEVERAL ACCOUNTS.

1. A bond given by a postmaster, with sureties, for the performance of his official duties, does not constitute a binding contract, until approved and accepted by the postmaster general.

2. The reception and detention of an official bond, by the postmaster general, for a considerable time, without objection, is sufficient evidence of its acceptance.

[Cited in Broome v. U. S., 15 How. (56 U. S.) 155.]

[Cited in Meyer v. Morgan, 51 Miss. 21.]

3. The return of an official bond to the principal obligor, by the postmaster general, for the purpose of obtaining an additional surety, affords no proof that it had not been accepted: nor does it amount either to a surrender or cancelling of it.

4. Where a debtor, indebted on several accounts, makes a payment, he may apply it to either account; if he does not, the creditor may do so; if neither does, the law will appropriate it according to the justice of the case, provided there are no other parties interested.

5. A debtor cannot appropriate a payment, in such manner as to affect the relative liability or rights of his different sureties, without their assent.

[Cited in Pickering v. Day, 3 Houst. 539. Cited in brief in Porter v. Stanley, 47 Me. 518.]

6. Where a public officer has given successive official bonds with different sureties, moneys received subsequent to the execution of the latter, cannot, before it is discharged, be applied to the payment of the former.

[Cited in Ornville v. Pearson, 61 Me. 555; Paw Paw v. Eggleston, 25 Mich. 40; Pickering v. Day, 3 Houst. 539.]

7. Where a public officer has given different bonds with different sureties, his payments must be so appropriated as to give each bond credits for the moneys respectively due, collected, and paid under it.

8. The law which limits suits by the postmaster general against sureties, to two years after a default of the principal, does not operate in cases of balances unpaid at the end of a quarter, which are subsequently liquidated by the receipts of a succeeding one.

[Cited in Jones v. U. S., 7 How. (48 U. S.) 692; U. S. v. Kershner, Case No. 15,527.]

[Cited in Frost v. Mixsell, 38 N. J. Eq. 601.]

[9. Cited in Allen v. State, 61 Ind. 275, and Ohning v. City of Evansville, 66 Ind. 63, to the point that new sureties are not responsible for prior defalcations unless the condition of the new obligation shall embrace them.]

On the 7th June, 1825, the postmaster general addressed a letter to Richard Bache, then postmaster at Philadelphia, in which he stated, as follows: "Some weeks since I directed a bond to be sent to you as postmaster, that you might have it executed under the post office laws, passed at the last session of

---

[1] [Reported by Henry D. Gilpin, Esq.]

congress. This measure has become necessary by reason of the decision of Judge Johnson, who lately decided that bonds given by a deputy postmaster, under the law lately repealed, could not be enforced. Although I believe this decision to be erroneous, and that the supreme court will reverse it, yet, it becomes my duty to guard the public interest, by taking the precautionary step of renewing the bonds of all postmasters which were executed under the late law. I will thank you to inform me whether you have received the bond transmitted to you. If you have not another shall be sent." On the 15th of June, Mr. Bache acknowledged the receipt of this letter, and said that the delay in returning the bond had been occasioned by one of the gentlemen, whom he wished as his surety, being out of the city, but that it should be executed and sent in the course of the week. On the 1st of July, the usual quarterly settlement of his accounts as postmaster was made, and it appeared that the debits against Mr. Bache, on that day, exceeded his credits or payments by the sum of twenty-six thousand nine hundred and forty-nine dollars and nineteen cents, leaving him indebted to the United States in that sum at that time. On the 8th July, Mr. Bache, together with William Milnor, Jr., and John Norvell, executed a joint and several bond to the postmaster general in the penal sum of thirty thousand dollars; being the same which was referred to by that officer in his letter of the 7th June. The condition of the bond set forth that Richard Bache was then postmaster at Philadelphia, and it provided, "that if the said Richard Bache should well and truly execute the duties of the said office, and faithfully, once in three months and oftener if thereto required, render accounts of his receipts and expenditures as postmaster to the general post office, in the manner and form prescribed by the postmaster general, in his several instructions to postmasters, and should pay all moneys that should come to his hands, for the postages of whatever is by law chargeable with postage, to the postmaster general of the United States for the time being, deducting only the commission and allowances made by law for his care, trouble, and charges in managing the said office; and should also faithfully do and perform, as agent of the general post office, all such acts and things as might be required of him by the postmaster general; and moreover should faithfully account with the said postmaster general, for all moneys, bills, bonds, notes, receipts, and other vouchers, which he as agent as aforesaid should receive for the use and benefit of said general post office," then the bond was to be void. On the back of the bond was a certificate of the same date, by an alderman of the city of Philadelphia, that "in his opinion the sureties therein were sufficient." This bond was transmitted to the post office department; on what day is not ascertained, but probably about that on which it bears date. On the 15th September, another settlement of Mr. Bache's accounts as postmaster took place, by which it appeared that from the 8th July, the date of his bond, to that day, he had paid the sum of twenty-nine thousand seven hundred and forty-six dollars and sixteen cents, extinguishing the balance due on the previous quarter, and leaving a credit in his favour of two thousand seven hundred and ninety-six dollars and ninety-seven cents. On the 21st September, the bond was returned to Mr. Bache by the postmaster general, inclosed in a letter in which he stated, as follows: "I am informed that William Milnor, Jr., whose signature is placed to the inclosed bond, as one of your sureties, possesses little or no property. As two sureties are required by the rule of the department, it is proper that they should both be in such circumstances as to property as to make their responsibility safe for the public. If the fact be as above stated as to Mr. Milnor, it will be necessary for you to procure another signature to your bond. I have purposely delayed returning this bond, until after you had paid the late requisition of the department, in order that its return might not embarrass you. As you have more than complied with the requisition, and reduced your balance to a small sum, I presume you will have no difficulty in complying with this request." On the 15th December, Mr. Bache wrote to the postmaster general that he would attend to the surety the following week, "when he hoped to forward one that would meet his approbation." On the 12th June, 1826, the postmaster general wrote to Mr. Bache, that "his bond yet remained to be perfected." On the 14th March, 1828, the assistant postmaster general wrote to Mr. Bache reminding him of the assurances given in his letters to the department, and asking his immediate attention to the return of his bond with the additional surety required on the 21st September, 1825. On the 7th April, the postmaster general himself addressed a letter to Mr. Bache, in which he stated as follows: "Col. Gardner informs me that you have not returned your bond as postmaster with the additional surety necessary. I regret that this subject has not been attended to by you before, and hope you will lose no time in procuring an additional name to your bond, which may be good for the amount of the penalty; at least, the whole number should be considered good for that sum. I was not aware until a few days since, that the bond had not been returned." On the 14th April, Mr. Bache informed the postmaster general, in reply, that he would "give him a definitive answer in the course of the next day respecting his bond, after seeing some of his friends." On the 20th April, Mr. Bache was superseded as postmaster; and on the 13th May, the bond in question was deposited with the attorney of the United States, "to be retained until it

was decided who had a just claim to it; as it was claimed both by the postmaster general and the sureties." On a settlement of the accounts of Mr. Bache, it was found there was a balance due by him of twenty-two thousand two hundred and thirty-five dollars and fifty cents; thereupon separate suits were instituted, in this court, against him as principal obligor, and Mr. Milnor and Mr. Norvell, each of the sureties in the bond. The declaration in the present action against John Norvell is for the amount of the penalty in the bond. It sets out the condition at length, as above stated, and then avers the non performance thereof by the postmaster, Richard Bache, in all particulars, but especially "in not paying the said sum of twenty-two thousand two hundred and thirty-five dollars and fifty cents, being money that had come to his hands for postages." To this the defendant pleads: 1. That the bond was not accepted by the postmaster general, and so was not delivered by the defendant John Norvell, and that it is not his deed. 2. That Richard Bache did, during the time he was in office, after the date of the bond, truly execute the duties of his office, and that he did not make default by not paying the said sum or any other sum of money whatever.

On the 17th November, 1829, the case came on for trial before Judge HOPKINSON and a special jury. It was argued by Dallas, district attorney, for the postmaster general, and Swift & Randall for the defendant.

Mr. Dallas, for the postmaster general.

The defendant has voluntarily entered into a contract with the United States, which, however its existence may be regretted, it becomes a plain duty of the court to enforce. Such contracts are necessary by law, and it is a loose and dangerous morality which would set them aside, merely because they may ultimately bear hard on those who have made them. This is an action to recover a debt due upon a bond in consequence of an alleged breach of the condition. The sum claimed is the amount to which the United States say they have been injured by that breach. This bond has been produced and given in evidence; it is in all its requisites apparently complete; it has parties, with their signatures and seals duly attested by subscribing witnesses; in all these incidents nothing has been alleged to affect its validity. The condition of the bond is distinct and legal; and, if it has been broken in any of its particulars, the penalty is incurred and the damage has been produced. That it has been appears by the account of Mr. Bache, the postmaster at Philadelphia and the principal obligor in the bond. The account, as given in evidence, is a transcript authenticated according to law: a running account of receipts and payments taken from the books; a reckoning between the government and its agent. It shows the moneys that were received by the postmaster from postages be-

tween the date of the bond, when the obligation of the defendant commenced, and the time this suit was brought. It proves conclusively that all the money received during this period was not paid when the balance was finally struck. This is a breach of the condition of the defendant's obligation and makes him liable on his own contract. 3 Story's Laws, 1996. No facts given in evidence impair the validity of the defendant's obligation under the bond. It was entered into by express authority of law. It was transmitted to the postmaster general after it had been duly executed at his own request. It was received and retained by him as a legally executed instrument. The purposes for which it was sent back did not relate to Mr. Norvell, the defendant. There was no objection whatever to him. His name was not to be taken from the bond. Whatever objection there was related to Mr. Milnor alone. Nor was it sent back for any cause affecting its validity; but merely to increase its security. 3 Story's Laws, 1986; Smith v. Bank of Washington, 5 Serg. & R. 318; North v. Turner, 9 Serg. & R. 244. Nor were any facts given in evidence to controvert the correctness of the account. It is clear that there was a balance in favour of Mr. Bache, of two thousand seven hundred and ninety-six dollars and ninety-seven cents on the 15th September, 1825, and a balance against him of twenty-two thousand two hundred and thirty-five dollars and fifty cents, when he was superseded; showing that, after the date of the bond, he had received moneys to the amount claimed, which he had not paid over. In settling the account, the postmaster general had a right to appropriate the intermediate payments by Mr. Bache to the extinguishment of his debt, in such order as he deemed best. When a man is indebted on several accounts and makes a payment he may direct its appropriation; if he does not the receiver may; if neither does, the law will appropriate it justly and equitably. It is just and equitable that payments should be appropriated to extinguish debts according to their order of time. Applying this rule, Mr. Bache became in arrear during the last quarter. The account shows a superabundance of payments, in each quarter, to pay what was due on the antecedent quarter. The settlements were made and the balances struck quarterly; and the United States have applied the money paid during each quarter, to any arrears that might be due at its commencement. This they had a clear right to do, especially as Mr. Bache made no appropriation. The account, therefore, being unimpeached as to the correctness of its items, shows that the balance was due when suit was brought, that it is chargeable to the last quarter, and that it is for postages received and not paid. 3 Story's Laws, 1996 [4 Stat. 112]; Mayor of Alexandria v. Patten, 4 Cranch [8 U. S.] 317; Field v. Holland, 6 Cranch [10 U. S.] 8; U. S. v.

January, 7 Cranch [11 U. S.] 572; U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 720; U. S. v. Vanzandt, 11 Wheat. [24 U. S.] 184; U. S. v. Nicholl, 12 Wheat. [25 U. S.] 505; Dox v. Postmaster General, 1 Pet. [26 U. S.] 318; Postmaster General v. Reeder [Case No. 11,311]; Cremer v. Higginson [Id. 3,383]; Locke v. Postmaster General [Id. 8,441].

Swift & Randall, for defendant.

This is a contract between the postmaster general and the defendant. He is the officer who is authorised by law to make it, and the United States, in conferring on him the power, become bound by his acts in the exercise of it. He must do his duty properly; if he neglects or errs in it they are to suffer. His actions are their actions, and if the surety derives a benefit from them, it would be the height of injustice to deprive him of it, on the plea that no laches can be imputed to the government. Hodgson v. Dexter, 1 Cranch [5 U. S.] 345; Bainbridge v. Downie, 6 Mass. 253; Walker v. Swartwout, 12 Johns. 444; Macbeath v. Haldimand, 1 Durn. & E. [1 Term R.] 172.

We are to ascertain, therefore, whether there is now any existing contract between the postmaster general and Mr. Norvell, and if so, whether this contract binds him to pay the sum of money demanded.

I. There is no such contract now existing, because the bond was not a valid instrument at the time the suit was brought. It is true it was signed and sealed by the defendant, but that is not enough; an unqualified, unconditional delivery of it by him is equally necessary, and also an unqualified unconditional acceptance by the postmaster general. There is no positive evidence that this bond was ever sent to Washington; but supposing that it was, this is not a case in which mere possession will prove either its delivery or acceptance. That might be enough in an ordinary case, but not where the approbation of a public officer is made essential to its validity. Until that is given the instrument is imperfect and incomplete. The only evidence of his approbation is his acceptance of it; without acceptance there can be no delivery; in fact there is a refusal to receive, so far as the interests of a surety are involved. In this case there is no proof of the postmaster general's approbation; on the contrary, he returned the bond as insufficient; in his own words he required it to be "perfected." On the most obvious principles of law, therefore, there is not now, and indeed never was, a perfect or binding contract made by this defendant with him. 3 Story's Laws, 1986, 1995 [4 Stat. 103, 111]; 1 Shep. Touch. 57; Whelpdale's Case, 5 Coke. 119; Chamberlain v. Stanton, Cro. Eliz. 122; Jackson v. Phipps, 12 Johns. 418. But even if approved at first, it was afterwards returned by the postmaster general, as insufficient, an act clearly within his legitimate power. He is by law expressly directed to superintend all the duties of his department; he is required to take from postmasters security which is good and approved, and of course, to reject what he believes or discovers to be inadequate. As he can have but one bond at the same time from one officer, to deliver it up for the purpose of obtaining a better, is clearly within the scope of his authority. That he meant to do so here is evident. His letter states, that it is returned, because it is insufficient. It is allowed to remain for nearly three years in the possession of the obligor, and it has now become evidence only because it has been placed in the possession of the attorney of the United States, for the purposes of this suit, but not so as to affect the rights of the sureties. 3 Story's Laws, 1985, 1986; Shep. Touch. 70; 2 Bl. Comm. 307, 309. It cannot be said that it was returned for the purpose of being altered; of having another name inserted in the same instrument of writing; for that would be illegal. Such an alteration without the consent of the defendant would completely invalidate it; it is immaterial whether the object be to increase or decrease the liability of any party. Whether it does injury or not to the obligor; whether the change be trifling or material; whether the motive be good or bad; it is sufficient that the identity of the instrument is changed. Speake v. U. S., 9 Cranch [13 U. S.] 28; Moore v. Bickham, 4 Bin. 1; Stephens v. Graham, 7 Serg. & R. 505; Marshall v. Gougler, 10 Serg. & R. 167; Barrington v. Bank of Washington, 14 Serg. & R. 405; Homer v. Wallis, 11 Mass. 309; Jackson v. Dunlap, 1 Johns. Cas. 114; Pigot's Case, 11 Coke, 27; Master v. Miller, 4 Durn. & E. [4 Term R.] 320; Johnson v. Baker, 4 Barn. & A. 440.

II. But even if this bond had been completely executed; if it had been delivered, accepted, approved and retained by the postmaster general; if it were now an existing contract between him and the defendant, he is not bound by it to pay the sum of money above demanded, because the debt has not in fact accrued since the bond was given. The balance is not created by a neglect to pay over the moneys received, but by the act of the postmaster general himself, in appropriating improperly the payments of Mr. Bache. No doubt where a debtor, having several accounts, makes a payment to his creditor without any specific direction, it may be appropriated at the pleasure of the latter, where they are the only parties. But this cannot be done where the interests of a third party are affected. In such a case the right of appropriation does not apply, and this is one. There was a balance of twenty-six thousand nine hundred and forty-nine dollars and nineteen cents, due by Mr. Bache at the time this bond was executed; for the payment of this the postmaster general ought to have looked to the previous security, but he has paid it by applying the money received subsequently. Mr. Norvell is not security for that debt, yet money collected whilst

he is security, is taken to pay it. and he is then called on to make good the deficiency. This is in effect charging him as surety for a default which occurred before he gave bond. The amount with which he is thus charged exceeds that now demanded; consequently if he is improperly charged with it, there is no default which has accrued since he became responsible. U. S. v. January, 7 Cranch [11 U. S.] 572; U. S. v. Wardwell [Case No. 16,-640]; Armstrong v. U. S. [Id. 549].

On another ground, the postmaster general cannot recover this balance from the defendant. The act of congress declares, that when a postmaster makes default, the postmaster general must institute suit against him and his sureties, within two years after such default, or the sureties shall not be held liable. Mr. Bache has been a defaulter at every quarterly settlement since the 1st October, 1825, sometimes to the amount of twenty-nine thousand, never for less than fourteen thousand dollars. As no suit was instituted till 1st July, 1828, the parties have ceased to be liable. It was due to them that suit should be brought as soon as a default was discovered. This provision was for their benefit; they are favoured by the law; to deprive them of it would be to turn the plainest principles of the law against them. 3 Story's Laws, 1986 [4 Stat. 103]; Miller v. Stewart, 9 Wheat. [22 U. S.] 680; Com. v. West, 1 Rawle, 31.

Mr. Dallas, for the postmaster general, in reply.

I. The first ground on which the defendant resists the claim which the United States have acquired by his breach of his own contract, is by alleging that he in fact has made no such contract; that the paper produced is not his deed; in other words, that although it has form, shape, and features, it wants the life imparted by delivery and acceptance. Such an allegation will fall before an examination of the case. That the bond was actually delivered for the purpose it expresses, to the postmaster general, is incontrovertible; that he received it is equally so; all, therefore, that the defendant had to do was done. Against him, it remained a valid instrument; at all events until the 21st September, 1825. On that day it is said the postmaster general did what in effect cancelled it, by showing he had not accepted it. That he received and retained it for more than two months is beyond question; but, because, after thus retaining it, he doubts its sufficiency, it is alleged that he never accepted it. As the evidence stands, the question whether he did so or not, is purely one of law, to be resolved by written documents. These will show at once what the postmaster general meant, as well as what he did; his object, as well as the mode by which he attained it. His object certainly was neither the relinquishment nor destruction of the existing bond, nor the substitution of another for it; it was simply to obtain additional security, a desire which indeed, ex vi termini, im-

ports an acceptance, pro tanto, of the security already given. It has indeed been said that this object was inconsistent with the legal existence of the bond; whether it was so or not, is really irrelevant to the present argument, since no additional surety was obtained, no change was made in the parties. But it was not so; on the contrary, the object of the postmaster general, had it been attained, was perfectly consistent with the legal validity of the bond. The cases cited are all cases of erasure, interlineation, substitution, addition, or alteration, without consent of the parties, affecting the rights of some of them, and material. This would have been a case of addition, with consent of all the parties, and beneficial to all. The bond being several, an additional signature would not have affected the defendant in his relation to the United States, and would have been beneficial to him in contribution.

The object of the postmaster general therefore being simply to procure additional security, an object perfectly consistent with the legal existence of the bond, it remains to show there was nothing in the mode adopted by him, to obtain this additional security, which affected the rights of the United States, or the liability of the defendant. It is true he parted with the temporary possession of the bond, but that possession is neither necessary to preserve the rights of the United States, nor to destroy the liability of Mr. Norvell; the right, the control, the legal possession, was never given up; it was sent away for a specific purpose, its return was required, its detention was in disobedience of the directions of the postmaster general, and therefore never could defeat his rights. To review the cases cited, of conditional deliveries and acceptances, is unnecessary; because this bond was sent to the postmaster general without condition, not casually, but with the knowledge of all parties, and deliberately received and retained by him. To argue that, after becoming thus unconditionally possessed of it, his sending it to Mr. Bache for the sole purpose of obtaining another signature, was a refusal to accept it, is to presume a deliberate intention on his part to relinquish what he required to be returned, to destroy what he wished to strengthen. As far as deliberate intention is involved, it is absurd to suppose that he foresaw and desired to do any thing inconsistent with the legal existence of the bond. But if he really had such a desire, he intended to do what was not legally within his power. If the laches of a public officer will not affect the interests of the United States, neither will an intentional departure from authority. The idea that a public officer, because he is at the head of a particular department, or has the general superintendence of its business, possesses an unlimited control over the property or interests of the United States connected with that department, cannot be tolerated for a moment. His power is deducible from law alone, and is always compatible with an object contem-

plated by law; if the mode of exercising it be prescribed, he must pursue it and no other; if no mode is specifically directed, a discretion may indeed be implied, but not one inconsistent with, or destructive to, the object of law. The postmaster general, as superintendent of his department, is bound to exact security from an officer, before he permits him to act, and when obtained, although he may change it for equally good or better, he cannot relinquish or destroy it altogether. The principles, indeed, which regulate or restrain him, as a public agent, are the same as those relating to a private one; acts within the scope of his authority bind the principal; beyond it, they affect neither his rights nor interest.

The results then of the whole argument, relative to the delivery and acceptance of this bond, to the object of the postmaster general in returning it, and to his whole conduct in regard to it, are these: that no express acceptance is necessary in receiving such an instrument from a postmaster for the United States; that if necessary, it was fully given, when, in asking additional security, he necessarily accepted, pro tanto, what he had received; that its implied acceptance is apparent from its detention, its return for a specific purpose, and its repeated demand; that once given, and received, it belongs to the United States, and cannot be relinquished by their officer, without equal or better security; and that, never having been relinquished, it remains the valid evidence of a contract of the defendant with the United States. Hodgson v. Dexter, 1 Cranch [5 U. S.] 345; U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 720; Bainbridge v. Downie, 6 Mass. 253; Walker v. Swartwout, 12 Johns. 444; Macbeath v. Haldimand, 1 Durn. & E. [1 Term R.] 172.

II. The second ground on which the defendant resists the claim of the United States, is, that admitting the due execution, delivery, and acceptance of his bond, he is yet protected from suit by an express provision of law. The act of congress does indeed provide, that the defendant cannot be sued if there was a default by Mr. Bache, if it continued for two years, and if the postmaster general did not institute his suit during those two years. But it is not enough to say Mr. Bache was tardy in his payments, and in arrear at every quarterly settlement; if the arrears were paid off within two years, and fresh default made, it is not the same in time or amount. Now the account shows that there was no default which remained unpaid for six months, much less two years; it was settled quarterly, and each debit is for the postage of an entire quarter, though the credits are at various times; if at the end of the quarter these credits fell short of the amount of postages then debited, the next payment was of course applied to extinguish that arrear. Such is the usual way of keeping a running account; it is exactly that which exists between a

landlord and tenant, who would certainly apply what he might receive in the middle of a quarter, to extinguish the unpaid rent of a previous one. As to what has been said in regard to the appropriation of payments made by Mr. Bache, it is to be recollected that the government, no more than a landlord, knows whence the money comes with which the payments are made; whether the collections of a postmaster are on a prior or current quarter, any more than whether the rent paid is the product of tillage in this season or the last. It is not bound, either by principle or practice, to delve into the modes of financing, by its debtor, in order to ascertain the sources of his payments. The mode in which the postmaster general has appropriated the payments made to him, has been objected to; but his right to do so has been clearly shown by the various adjudged cases heretofore cited; and the practice is established, if it is not conceded. An examination of this account shows that, with the exception of the first quarter, the sums debited to any one quarter are never paid in until a month or two, or more, after they are due; on the 1st January, 1825, we find a balance against the postmaster of three thousand one hundred and fifty-seven dollars, while on the 15th September, following, having been urged in the mean time to make payments, he has overpaid, by that of two thousand seven hundred and ninety-six dollars. If this examination be carried down on these principles, the correctness of which cannot be doubted, it will be seen that no default occurs until on and after the 1st January, 1828, a period not only within that when the clear responsibility of the defendant as a surety exists, but also long within the two years previous to the commencement of this suit.

The result, therefore, of this inquiry is, that the defendant has failed to establish any thing in the mode of appropriating the receipts of Mr. Bache, adopted by the postmaster general, or in the time and manner of bringing this suit, which will relieve him from the liability he has incurred on the bond, already shown to be duly executed and accepted.

HOPKINSON, District Judge (charging jury). The bond on which this suit is brought, the condition, and the breach, are all admitted; that is, the signing and sealing of the bond, the terms of the condition, and the breach as laid in the declaration. The present defendant was not the principal in the bond, but one of the sureties of Richard Bache. He signed and sealed it, but contends that he is not liable to any responsibility under it, on several grounds, some of law, some of fact.

I. He says this bond was never delivered, in the sense of the law, because it was never accepted, without which the delivery is not complete. It is not denied that the defend-

ant had done all required of him; he had signed, sealed, and delivered it so far as it depended on him. Was an acceptance necessary? I think it was; not only on general principles, but peculiarly so in this case. It was to be approved by the postmaster general; he was to judge of its sufficiency; and until it was approved and accepted, it was no contract between the parties; it could not be a contract on one side only. Whether an acceptance was necessary, is a question of law; and I clearly think it was. Then was this bond accepted? This is a fact for your decision. If the question of acceptance depended on written evidence, or documents alone, it would be for the court, with whom the construction of such evidence is entrusted; but when it depends altogether on parol evidence. or partly on that, and partly on written testimony, it is for the jury, from a view of both, to decide the fact. In this case the acceptance is asserted on the one side, and denied on the other, not only from the written correspondence between the parties, but also from facts and circumstances, such as the time that elapsed between the receipt of the bond by the postmaster general and the return of it, a conversation held with me, and some other matters, which are enough to make it a mixed question of evidence, partly written and partly parol. But it is the duty of the court to give you some instruction as to the law on the subject. An acceptance of this bond by the postmaster general need not be proved by direct or express evidence. It is not necessary he should write, acknowledging the receipt, and accepting the security. It is probable this is never done. But receiving the bond, and detaining it for a considerable time, without objection, will be sufficient evidence of acceptance to complete the delivery; especially when the exception is taken by the party who had done all he could do to complete it. This accords with common sense and justice. In the ordinary case of an account, sent by one merchant to another, no objection being made in a reasonable time is a presumed acquiescence, and binds him. This is a much stronger case. If, therefore, you would not allow the postmaster general to deny his acceptance of this bond, after all he has written or done about it, you will not allow the defendant to do so.

Now, as to the time the bond was kept. This is not exactly ascertained, but we may make a reasonable presumption. It is dated 8th July, 1825, and one of the counsel for the defendant thinks it must have been sent about the same time. It is probable he is right. Why should it not be? Even then the delay, after the requisition made, had been long; and although this might have been occasioned by difficulty in getting sureties, yet, after they were got, why should Mr. Bache delay to send it, especially as he was hardly pressed for it by the postmaster general? On the 7th June, 1825, the

postmaster general writes to Mr. Bache: "Some weeks since I directed a bond to be sent to you, that you might have it executed." The bond must therefore have been sent at least early in May. On the 15th June, Mr. Bache answers, and says, that the delay had been occasioned by one of his sureties being out of the city, and, after his return, occupied by his own business; he adds, "It shall be executed, and sent to you in the course of next week." At this time Mr. Bache was at West Point. On the 8th July the bond was executed in this city, and, under all circumstances, the reasonable presumption seems to be, that it was sent to the postmaster general about the same time. From then, say the 15th July, to the 21st September, 1825, the postmaster general keeps the bond, without an intimation of hesitation or objection to its sufficiency, but with the means to inquire into it, had he thought necessary, in twenty-four hours. Can it be presumed he kept it under consideration all this time, when he does not appear to have made any inquiry to satisfy himself, or to have had any doubt? Did he leave the public interest for more than two months without any security, while he was hesitating, and would neither accept nor reject the bond, nor take a step to satisfy himself? You will judge; but it would be most unwarrantable neglect, and such as should not be supposed, without clear proof, against an officer of high reputation for a vigilant attention to his duty. Would it be in his mouth, after more than two months silent acquiescence, to say he had never accepted this bond? Had he kept an account current for half this time, could he deny his admission of it, at least prima facie?

On the 21st September, 1825, the bond was returned to Mr. Bache, with a letter. Now, the mere fact of sending it back does not prove that he had not accepted it. He might have fully accepted it for a week, or a year, and then, on finding the security was not sufficient, he might require either a new bond to be substituted, or an addition of security to be made to that he had. The sufficiency of the security is at all times under the direction of the postmaster general. The mere act then of returning this bond affords no proof that it had not been accepted. If the act, per se, affords no such proof, was it accompanied by any declarations by the postmaster general, showing such an understanding on his part? I reply, that he nowhere denies the acceptance expressly; and that it is not to be inferred from what he has written. In the letter of 21st September, 1825, in which the bond was enclosed, he says he is informed Mr. Milnor, one of the sureties, possesses little or no property. . As this information was the cause or inducement to write this letter, we may presume it was recent. Will you not infer from this, that until he got this information, he was satisfied with the bond; and, being satisfied, had accepted it? He

says that the rule of the department requires two sureties; he considers Mr. Milnor as standing for nothing "if the fact be so;" leaving it to Mr. Bache to prove the property of Mr. Milnor if he could. But, if the fact be so, what is to be done? Another signature is to be procured. Is there any thing here to show an understanding on the part of the postmaster general that he had not accepted this bond; that he was not entitled to all the security it offered, although he requires something more? The matter remains in this situation, without any communication from the postmaster general, until the 12th June following, about nine months, when the postmaster general writes, "your bond yet remains to be perfected." Can we suppose the postmaster general believes himself all this time without any security? Yet this would have been the case, if he had never accepted the bond, as far as it went. Remember the intention and acts of the postmaster general are to decide this question; for the defendant had done every thing on his part to complete the delivery of the bond. On the 7th April, 1828, the bond is not returned, but remains with Mr. Bache. Two years and a half elapsed, and there is no security. What does the postmaster general now write: "Col. Gardner informs me you have not returned your bond, with the additional security." He hopes he will lose no time in procuring the additional name. In all other respects the bond was to remain, and be returned as it was originally received. On the 14th March, 1828, a letter was written by Col. Gardner to Mr. Bache: "I am directed by the postmaster general to ask your immediate attention to the return of your bond, with the additional security required." We have here all that the postmaster general has done and written on this subject. Take it all together and decide whether, from it, you can infer that he understood or intended not to accept this bond; for on his intention and acts it depends. How did Mr. Bache himself understand the matter? On the 15th December, 1825, he writes: "I shall attend to the surety next week, when I hope to forward one that will meet your approbation." On the 14th April, 1828, he says: "I shall endeavour to give you a definitive answer, in the course of to-morrow or the next day, respecting my bond, after seeing my friends." Under this evidence, and the remarks I have made to aid your consideration of it, the question of acceptance is left to you. If the bond was never accepted, there is an end of the case.

II. If accepted, did the return of the bond amount to a surrender of it, to annulling, or cancelling it? This depends on the intention of it. That it was sent to Mr. Bache does not show it, but it depends on the purpose for which it was sent. If he had abused the confidence put in him, kept the bond, destroyed it, or would now turn his possession of it to a use never intended, it can avail nothing. It is of the same force and validity as if it remained with the postmaster general at Washington. There is nothing by which this intention is to be judged but the correspondence, and this makes it a question of law. It is clear that there was no intention to cancel or annul the bond, or to substitute another, but only to strengthen the same bond by an additional surety. When such surety was procured, it was to be returned, not a new one executed. This is the language of both of the parties, clearly, and expressly. The question whether the bond was cancelled by the return of it, is different from the question, whether it was accepted or not. The argument and authorities to show that any alteration in a deed will avoid it, might have been important, if the intended addition had been made to it; but as this was not done, the bond remains now just as it was when executed, and its identity cannot be doubted. If, therefore, you shall be of opinion, that this bond was accepted, then as it is clear it never has been cancelled, it remains in full force, and the question of the liability of the defendant to all, or any part of the claim, is to be examined by you.

III. It is said that at the time this bond was executed, and long before, a large balance was due from Richard Bache to the government, and that moneys collected and paid by him, after the execution of this bond, have been applied to the payment of that antecedent balance. It is urged that this is, in effect, to charge these sureties with a default which occurred before they became so; that the moneys which should have been applied to the credit of their responsibility, have gone to the relief of sureties in an antecedent bond. Before we examine to what extent the facts sustain this objection, we will look to the law for our guide, in deciding upon them; and this will necessarily lead us into an inquiry into the doctrine of the appropriations of payments, which seems to be well settled, and with no material variation, through a long course of decisions and years. We need not go further than to the cases decided in the supreme court of the United States. The general doctrine certainly is, that where a debtor makes a payment, and is indebted to the creditor on several accounts, he may direct to which debt or account, the payment shall be applied. If he gives no such direction, the creditor receiving the money may apply it at his pleasure. If both omit it, the law will apply it according to the justice of the case. There can be no objection to this doctrine where no party is concerned but the debtor and creditor. But how is it in a case like the present? Here a public officer, in the receipt of public money, has given sureties for the faithful performance of his duties, and for the accounting for and payment of all the moneys which shall come to his hands. These sureties remain for several years, and then a new bond, with new sureties, is given; at which time there is a large sum of money actually due to the public,

and for which the sureties on the first bond were liable; that is to say, the penalty of the first bond was actually forfeited, and the amount of the defalcation due, and recoverable from the sureties in it. Can the government, for whose security both bonds were given, apply the moneys collected by the officer after and under the second bond, and on the responsibility of the sureties in the second bond, to the payment or credit of the balance due on moneys collected, and which ought to have been paid, by and under the first bond? Can the burden actually resting upon the first sureties, can the forfeiture actually incurred by them, be shifted by the process of appropriation, without the consent or knowledge of the second surety, from the shoulders of the first, and be put upon the second? I am of opinion, most clearly, that it cannot; that each set of sureties must answer for its own defaults, and is entitled to be credited with its own payments. If authority can be required to sustain a principle of such obvious justice, it will be found in the case of U. S. v. January, 7 Cranch [11 U. S.] 572, which is a much stronger case than the present. In that case a collector of revenue had given two bonds at different periods, for his official conduct; and the second bond undertook not only for the future, but also for the past, fidelity of the officer. The supervisor had promised to apply all the payments he should receive to the discharge of the first bond, before he carried any of them to the credit of the second; he keeping but one general account against the collector. At the time of the trial, the general balance against the collector was upwards of sixteen thousand dollars, but at the time when the second bond was given, it was but six thousand dollars and upwards. The payments, if all applied to the first bond, would have discharged it. The principal question in the case was, whether this promise of the supervisor was an appropriation of the money binding on the United States without some act appropriating it, as entries in the books, for this was the question brought up from the court below. The supreme court first state the law on the appropriation of payments generally, as I have stated it, and then proceed in declaring their opinion, "that the rule adopted in ordinary cases is not applicable to a case circumstanced as this is, where the receiver is a public officer not interested in the event of the suit, and who receives on account of the United States, where the payments are indiscriminately made, and where different sureties, under distinct obligations, are interested. It will be generally admitted," they say, "that moneys arising, due, and collected subsequently to the execution of the second bond, cannot be applied to the discharge of the first, without manifest injury to the surety in the second bond; and, vice versa, justice between the different sureties can only be done by reference to the collector's books; and the evidence which they contain may be supported by parol testimony." How is justice to be done between the different sureties by a reference to the collector's books? Certainly by seeing when the payments were made, and applying them accordingly to the first or second bond. The reference to be made to the books is for this purpose; and not to adopt as conclusive the appropriation then made by the officer, which was contended for by the district attorney. To ascertain how far this principle will go to the relief of the defendant in this case, we must turn to the account, which is a copy from the books, and see how much of the defendant's money, if I may call it so, has been applied to the relief of the prior sureties; because if it shall appear that the prior sureties have been paid by other moneys, in part or in whole, than those which were due and collected under the second bond, it is manifest the second sureties have no ground of complaint, further than their money has been taken for this purpose. On the other hand, there must be deducted from the final balance, now charged against the defendant, so much of the postages received since 8th July, 1825, as has been diverted from them, and applied to the first bond. This must be ascertained, as far as it can, by an examination of the account which I shall willingly refer to you; believing you will have to leave something to conjecture.

I will, however, direct your attention to some points of inquiry. The bond under which the defendant is liable, is dated on 8th July, 1825. On the supposition that it was sent at once to Washington and accepted, we may presume the contract was completed on or about 10th July, 1825, and then had reference back to the date of the bond, at which time the liability of defendant for the conduct of Mr. Bache commenced, to wit, on 8th July, 1825. It appears by the account, that on the quarter ending the 1st July, 1825, the debits against Mr. Bache exceeded his credits or payments by the sum of twenty-six thousand nine hundred and forty-nine dollars and nineteen cents. By payments made between that date and the 15th September, this balance was paid, and overpaid, leaving a balance in his favour of two thousand seven hundred and ninety-six dollars and ninety-seven cents, and had it been discharged by payments made before 1st July, the defendant would have nothing to do with it, but would have entered upon his suretyship on a clear field, and have been answerable for all subsequent delinquency. You will remark, however, that this is taking the debit to 1st July, and bringing the credits or payments to 15th September, two months and a half later. Between the postmaster general and Mr. Bache, this is of no importance; but as regards the sureties, where the inquiry is, whether these payments have been appropriated or not to their injury, the question is different. After the 1st July, and indeed on and after the date of the bond and of the commencement of

the defendant's suretyship, there were paid twenty-nine thousand seven hundred and forty-six dollars and sixteen cents. Did the whole of this consist of moneys received under the second bond? If it did, then it is a greater amount than the whole balance now due; and of course if this amount of their money has been paid to make up the deficiencies of an antecedent suretyship, and must now be restored to their credit, nothing is due from them. In other words, if the balance of twenty-six thousand nine hundred and forty-nine dollars and nineteen cents which Mr. Bache owed on 1st July, 1825, has been paid with postages afterwards received, it is clear that if those payments had been applied to the subsequent debits of this account, nothing would be due, but there would be a balance in favour of the second bond. I mean to say, suppose the account had been closed on 1st July, 1825, Mr. Bache and his then sureties would have been debtors for twenty-six thousand nine hundred and forty-nine dollars and nineteen cents; and if a new account had been opened with the second bond, there would have been no default under it, provided the payment which, in September, 1825, extinguished the above balance, was made by moneys received for postages paid under the second bond. This then is the matter of fact for you to ascertain from the account: how much of defendant's money has been applied to pay the antecedent debt. At the first view, we see that the whole of these payments made between 1st July and 15th September, could not have been from moneys received for postages between those periods. The payments made were twenty-nine thousand seven hundred and forty-six dollars and sixteen cents; the whole postages charged to Mr. Bache, for the quarter, from 1st July to 1st October, were seventeen thousand four hundred and fifty-six dollars and forty-nine cents; the payments, therefore, exceeded the whole receipts for the whole quarter by the sum of twelve thousand two hundred and eighty-nine dollars and sixty-seven cents, which, therefore, Mr. Bache must have obtained either from antecedent postages not before collected and paid, or from other resources. This sum did not come from the receipts after and under the second bond, or from the funds equitably claimed by the defendant. On this view the accounts would stand as follows:

| | |
|---|---|
| From the whole payments of...... | $29,746 16 |
| Deduct money not under the second bond ..................... | 12,289 67 |
| Taken of receipts under second bond ........................ | $17,456 49 |
| Deduct probable postages from 1st July, to 8th July, belonging to first bond, say.................. | 2,000 00 |
| Money of second bond, applied to the first ...................... | $15,456 49 |
| Whole deficiency now claimed..... | 22,235 50 |
| Chargeable to second bond........ | $ 6,779 01 |

The principle of law is, that you shall not take the moneys due and collected subsequently to the execution of the second bond, and apply them to the discharge of the first bond: and when you have ascertained how much of the money, which became due and was collected under the second bond, has been applied to the discharge of arrears due under the first, you will deduct that amount from the whole default claimed at the conclusion of the account.

We must go one step further in this analysis. The payments stop on the 15th September, 1825, and, of course, no part of them could have been derived from postages between that date and the 1st October. If these are estimated at two thousand five hundred dollars that sum should be added to the liability of the second bond, or, which is the same thing, taken from the credit we have given to it; which would leave the sureties in this bond now chargeable with nine thousand two hundred and seventy-nine dollars and one cent; and they will then have full credit against the general balance, for all the money that was taken from them for the payment of the debt, which was due before they became sureties. Of consequence, they will be charged with no defaults but such as occurred after their liability began, and full justice will be done to them. Indeed, if we knew certainly where Mr. Bache got the funds, with which he made the payments from the 8th July to the 15th September; that is, if we knew that all of them were derived from antecedent postages, the present sureties would be properly chargeable with the overpayment of two thousand seven hundred and ninety-six dollars and ninety-seven cents, which has gone to their credit, but came not from their funds, and belonged to the sureties of the first bond. You must not forget that justice is also due to them. A suit is now depending against them in this court; and they must answer for all that is not recoverable here. You should consider that you are settling the account between the two sets of sureties, rather than between the United States, and either of them; and your object should be to give to each bond credit for the moneys respectively due, collected, and paid under it. This is the true justice of the case. After all the payments that have been made, on closing the account, twenty-two thousand two hundred and thirty-five dollars and fifty cents are found due to the United States, from one or both of different sureties. You should give to the present defendant all the benefit of all the payments made with moneys due, collected and paid to the postmaster general under his bond; and you should, in like manner, give to the sureties in the first bond, credit for all the payments made with moneys due, collected, and paid, under their bonds, and the result will show how the remaining debt should be apportioned between them.

IV. The defendant has offered another ground, which goes to the whole right of re-

covery. By the third section of the act of congress of March, 1825 [4 Stat. 103], it is enacted, "that if default shall be made by a postmaster, at any time, and the postmaster general shall fail to institute suit against such postmaster, and his sureties, for two years from and after such default shall be made, then, and in that case, the said sureties shall not be held liable to the United States, nor shall suit be instituted against them." It is alleged by the counsel for the defendant, that if the postmaster has been in default at the end of every quarter for two years, antecedent to the suit, the sureties are discharged; and that in this case large balances were due from the postmaster, at the end of every quarter, for more than two years before suit brought. The district attorney contends, that at the end of various quarters, within that period, balances were in favour of the postmaster, and that this suit is not brought for any default of two years standing, but, in fact, for a default which accrued in the last quarter; all antecedent suits having been discharged by payments appropriated to them, in a manner warranted by law and usage. I confess I cannot see any difficulty in this question. It must be borne in mind, that the right of appropriating payments stands on a very different footing here, from that which it had on the question between two sets of sureties in two different bonds. Each is liable for defaults of two distinct periods. To apply the money received, during one of these periods, to discharge a responsibility incurred in the other, is manifestly unjust, and therefore, in such case, the general right of a receiver of money, to appropriate it, when the payer does not, was restrained by the clearest principles of justice. He was bound to credit the party with the payment, who was interested in the fund from which it was derived, or he would make a surety responsible for a default for which he never undertook. But the case is altogether different where the parties interested in the payments are the same, and are equally answerable for all. In such cases the right of appropriation has been repeatedly decided and recognised in its full force and extent. By the act of congress, the sureties of a postmaster are not to be sued for a default of their principal, if the postmaster general shall fail to institute a suit for such default, for two years after it shall be made. Is this suit instituted for a default made two years before it was instituted? The suit was brought on the 1st July, 1828, to recover the sum of twenty-two thousand two hundred and thirty-five dollars and fifty cents. Was this default made two years before; that is, on 1st July, 1826? On that day the whole amount received by Mr. Bache was seventy-five thousand three hundred and seventy-eight dollars and twenty-three cents; his payments were fifty-six thousand seven hundred and ninety-six dollars and ninety-seven cents; on that day, therefore, eighteen thousand five hundred and eighty-one dollars and twenty-six cents, was the amount of his debt or default; and if the account had then stopped, and no further payments had been made, certainly the defendant would have had the benefit of the limitation of the act. But the account goes on, debits are charged, payments are credited, the balances vary and fluctuate, sometimes being in favour of the postmaster, until at the final close he stands indebted in twenty-two thousand two hundred and thirty-five dollars and fifty cents. But it is said that this has been effected by the postmaster general, who has improperly applied the payment of moneys received after the termination of a quarter, to the balance then due; or that the moneys paid in a subsequent quarter, were applied to pay what remained due on the antecedent one. Assuredly he had a right to do so, and had he not done so, the court would have done it for him. But it is clear he has so appropriated these payments.

The case of rent is put by the district attorney. So of three promissory notes, of one hundred dollars, payable annually; no payment is made the first year; in the second year, before the second note is due, or even after, one hundred dollars are paid; so also in the third year, without any direction by the payer. The receiver applies the first payment to the first note, and the second to the second, leaving the third unsatisfied. He sues on the third note. Can the debtor say it is more than six years since the first note was due, and deny the right to apply his payments to the second and third? If there could be any doubt in a matter so plain, it is put at rest by the decision of the supreme court of the United States, in Kirkpatrick's Case, 9 Wheat. [22 U. S.] 737. The language of the court is: "The general doctrine is, that the debtor has a right, if he pleases, to make the appropriation of payments; if he omits it, the creditor may; if both omit it, the law will apply the payments, according to its own notions of justice. Neither party can claim the right, after the controversy has arisen; and, a fortiori, at the time of the trial. In cases like the present, of long and running accounts, where debits and credits are perpetually occurring, and no balances otherwise adjusted than for the mere purpose of making rests, we are of opinion, that payments ought to be applied to extinguish the debts, according to the priority of time; so that the credits are to be deemed payments, pro tanto, of the debts antecedently due." In our case the postmaster general has clearly appropriated the payments made, from time to time, by Mr. Bache, who gave no direction concerning them, but made them without any discrimination of the fund, from which they were derived, and left them to be applied, according to the pleasure of the postmaster

general, and the usage of his office; and the appropriation thus made is precisely that which the supreme court has declared to be according to justice, and such as the court would direct, if neither of the parties had done so. The application, therefore, of the moneys received in a subsequent quarter, to the payment of the debt or balance antecedently due, being perfectly correct and lawful, it follows, that no part of the default, for which suit is brought, accrued two years before; on the contrary, all the balances antecedent to the last quarter were extinguished by the successive payments, and the final debt or balance falls on the final quarter. I am entirely clear that the limitation of the time of bringing suit, provided in the third section of the act of March, 1825, cannot avail the defendant.

The case then stands before you on these points: (1) Was the bond accepted; and of this you will judge. (2) If accepted, was it afterwards cancelled, and its obligation annulled. This is matter of law; and I am of opinion it was not. (3) The moneys arising, due, and collected under the second bond, cannot be applied to the discharge of the first bond. You will ascertain how much money, if any, has been thus applied, and deduct it from the amount claimed as finally due, on the whole account. (4) The suit has been brought in good time, and is not barred by the limitation of two years in the act referred to.

The jury found a verdict for the defendant.